IN THE UNITED STATES COURT OF APPEALS

FOR THE FIFTH CIRCUIT

———————

No. 95-21027

———————

UNITED STATES OF AMERICA

Plaintiff-Appellee,

versus

STACY ANNE PALMER

Defendant-Appellant.

———————

No. 96-20109

———————

UNITED STATES OF AMERICA

Plaintiff-Appellee,

versus

STACY ANNE PALMER
SAMUEL LLOYD DEBLASIO

Defendants-Appellants.

Appeals from the United States District Court
For the Southern District of Texas

———————
September 3, 1997

Before POLITZ, Chief Judge,  HIGGINBOTHAM, and SMITH, Circuit Judges.

HIGGINBOTHAM, Circuit Judge:

Defendants were convicted of mail and wire fraud for engaging in a nationwide telemarketing scheme. Stacy Anne Palmer argues that her conviction was barred by double jeopardy, that her trial should have been severed from that of DeBlasio, and that the district court erred in applying the Sentencing Guidelines.  Samuel Lloyd DeBlasio argued his counsel was ineffective and that his sentence was miscalculated.  We are compelled to conclude that Palmer has waived both her double

jeopardy and severance claims . We affirm the district court's application of the Guidelines to DeBlasio and dismiss Palmer's sentencing challenge for lack of jurisdiction. Finally, we decline to reach the merits of DeBlasio's ineffective assistance of counsel claim.

I.

In 1992, DeBlasio founded S&N Advertising, a company organized to operate a fraudulent telemarketing promotion. DeBlasio's scheme was a classic example of "advance fee" fraud, simplistic in design but effective in separating victims from their money. DeBlasio purchased the names of 1,430,455 individuals who had previously responded to telemarketing solicitations and sent to most of them a complicated mailing, designed by himself, which led its recipients to believe that they had won a new Ford Explorer in a special promotion. The mailing instructed its recipients to call a special telephone number to claim their prize. Telemarketers employed by S&N answered these calls. Upon receiving a call from a victim, the telemarketers would congratulate the caller and confirm that the caller had indeed won the automobile. To claim the prize, however, the telemarketers instructed the victims that they must first send S&N a large sum of money, typically described as covering the "tax, title, and tags" for the Explorer. S&N collected millions of dollars in this fashion. But they gave away no Ford Explorers.

Defendant Stacey Palmer was hired as a telemarketer for S&N in January 1993 and continued to work there until S&N shut down ten weeks later. Palmer was good at what she did. During her period of employment, Palmer was one of S&N's most productive telemarketers. She induced two elderly victims to send in $6,295.41 each, among the largest amounts taken from any particular victims by S&N. Nevertheless, she was a small player in a scheme that grossed approximately three million dollars.

DeBlasio, Palmer, and twelve others were indicted on April 7, 1995. All fourteen defendants were charged with conspiracy to commit mail and wire fraud and with aiding and abetting mail and wire fraud. In addition, DeBlasio was charged with money laundering and the government sought forfeiture against him.

Trying all fourteen defendants in the same proceeding proved difficult. On May 12, 1995, Palmer moved for severance, and on August 10, 1995, DeBlasio moved for a continuance because his trial counsel had become ill. The court denied Palmer's motion for severance, but it had concerns about the health of DeBlasio's counsel. After some discussion among the parties about how to resolve the problem, the court granted the government's unopposed motion to sever DeBlasio's case.

Two of the defendants pled guilty and the remaining eleven defendants, including Palmer, went on trial on August 14, 1995. Palmer was then five moths pregnant. In the midst of trial, on the morning of Thursday, August 17, 1995, Palmer's counsel informed the court that Palmer had just been admitted to a hospital after experiencing complications with her pregnancy. The parties agreed to recess to assess Palmer's status. After the recess, Palmer's counsel told the court that Palmer was still being evaluated but that her initial prognosis was serious. The government then suggested that Palmer waive her right to be present at the trial. After expressing initial reluctance about that option, Palmer's counsel conferred with Palmer by telephone and informed the court that Palmer would waive her right to be present for those witnesses whose testimony did not bear on her case. The government then presented several such witnesses in Palmer's absence. That afternoon, Palmer's counsel instructed the court that Palmer's doctor had determined that Palmer would not be available for trial until the coming Monday. The prosecutor advised the court that most of its remaining witnesses would implicate Palmer. Palmer's counsel offered to waive Palmer's right to be present so long as none of the prosecution's other witnesses implicated Palmer, an option the government rejected. The trial judge then noted that she was scheduled to attend a judicial conference in less that two weeks, but she concluded that it was possible to complete the trial before that time, despite the delays occasioned by Palmer's illness. After completing the day's testimony, the judge recessed the trial until Monday, August 21.

That Monday morning, Palmer's counsel instructed the court that Palmer had delivered her child prematurely and that it had died after two hours. Because Palmer understood that she would have to remain in the hospital for another day or two, Palmer's counsel requested a continuance until

3

that Wednesday. The court, however, expressed concerns about Palmer's physical ability to attend trial that soon, and the prosecution questioned whether Palmer would be emotionally capable of assisting in her defense, given the recent death of her infant. Palmer's counsel responded that Palmer would have to attend an upcoming funeral for her child, but that otherwise Palmer was eager for the proceedings to conclude. The court then decided to defer any further scheduling decisions until hearing back from Palmer's doctor. The parties again agreed to proceed with witnesses who would not implicate Palmer. Later, Palmer's counsel learned that Palmer would actually require an additional week of bed rest and counsel requested another continuance. The judge then informed the parties:

> The Court will sever the case against Ms. Palmer from the case against the remaining Defendants. The court will grant a mistrial as to Ms. Palmer only because I don't know any other alternative but to grant a mistrial as to Ms. Palmer.

The court further stated that Palmer was to be retried with the previously-severed DeBlasio. Palmer's counsel made no objection at this point and asked only to be excused from the proceedings. Palmer's counsel left court and the trial for the remaining defendants proceeded to a verdict.

On September 29, 1995, the government obtained a superseding indictment, adding a defendant, Kafil Khan. On November 30, 1995, four days before her second trial was scheduled to commence, Palmer moved to dismiss her indictment on double jeopardy grounds. By written order dated December 5, 1995, the trial court denied Palmer's motion. DeBlasio, Palmer, and Khan then went to trial, and the jury convicted them on all counts on December 13, 1995. The trial court sentenced DeBlasio to 168 months and Palmer to 27 months of incarceration. DeBlasio and Palmer then filed this appeal.

## II.

Palmer first asserts that because the court declared a mistrial in the first trial without her consent and without proper justification, she was twice tried for the same offense in violation of the principle of double jeopardy.

4

A criminal defendant possesses a "valued right to have his trial completed by a particular tribunal." Wade v. Hunter, 336 U.S. 684, 689, 69 S. Ct. 834, 837, 93 L. Ed. 974 (1949). Because of this right, a trial court cannot retry a defendant after declaring a mistrial sua sponte, unless the mistrial is justified by "manifest necessity." See United States v. Jorn, 400 U.S. 470, 91 S. Ct. 547, 27 L. Ed. 2d 543 (1971); United States v. Perez, 22 U.S. (9 Wheat.) 579, 6 L. Ed. 165 (1824).

A criminal defendant's right to see his case through to completion by the initial jury is not absolute, however. United States v. Bauman, 887 F.2d 546, 549 (5th Cir. 1989), cert. denied, 110 S. Ct. 1128 (1990). When a criminal defendant consents to a mistrial before the jury reaches a verdict, double jeopardy will not bar a reprosecution. Id. at 549. This consent can either be express or implied. If a defendant does not timely and explicitly object to a trial court's sua sponte declaration of mistrial, that defendant will be held to have impliedly consented to the mistrial and may be retried in a later proceeding. United States v. Nichols, 977 F.2d 972, 974 (5th Cir. 1992), cert. denied, 114 S. Ct. 106 (1993).

Palmer asserts that the court's declaration of a mistrial in this case was not justified by manifest necessity. Whatever the merits of Palmer's claim, we refuse to pass on it because we find that Palmer impliedly consented to the mistrial. After it repeatedly delayed the proceedings and shuffled witnesses to accommodate Palmer, the trial court declared a mistrial as to Palmer on August 21, 1995. At that time, Palmer's counsel made no objections to the declaration of mistrial. Rather, her counsel's only statement before the court was a request to be excused from the proceedings. After the trial court granted that request, Palmer's counsel left the courtroom. Not until November 30, 1995, long after the first trial had concluded and just before her second trial, did Palmer object to the mistrial that had been declared on August 21. This fails to qualify as the "timely objection" required by our Circuit. See id.

Palmer defends her failure to object by arguing that her expression of a desire to complete the trial vitiates any implied consent to mistrial. On the morning of Monday, August 21, after Palmer's counsel had informed the court that Palmer would be available for trial that Wednesday but before

5

the parties had discovered that Palmer would in fact require an additional week of bed rest, Palmer's counsel expressed Palmer's feelings to the court:

> Frankly, [Palmer is] eager to come back to court just to get this done with, to get it over with.  She feels like she's under the gun, has been under the gun, and she wants to get it over with.  That was her opinion expressed to me.

Palmer argues that this statement demonstrates that she would never have consented to a mistrial. To support this position, she cites the law of another circuit to establish that where a defendant expresses a desire to proceed to a verdict prior to the court's declaration of a mistrial, that mistrial is presumably granted over the defendant's objection.  See Escobar v. O'Leary, 943 F.2d 711, 715-17 (7th Cir. 1991).  In addition, Palmer notes that some other circuits are reluctant to imply consent to a mistrial from a defendant's silence, especially if the defendant is somehow denied the chance to object.  See Love v. Morton, 112 F.3d 131, 138 (3d Cir. 1997); Glover v. McMackin, 950 F.2d 1236, 1240 (6th Cir. 1991).

Palmer had a meaningful opportunity to object, yet failed to do so.  Her expressed desire "to get it over with" was not an objection, nor was it stated contemporaneously with the declaration of mistrial.  Our precedents require that criminal defendants make timely, explicit objections to a sua sponte declaration of a mistrial, lest they be held to have impliedly consented to it.  See Nichols, 977 F.2d at 974.  A prior expression of a desire to continue the trial will not save a defendant from the implied consent doctrine.  Indeed, the defendant in Nichols expressed some displeasure at the possibility of retrying his case, noting his concerns about subpoenaing witnesses again and resolving scheduling conflicts for the second trial.  Id. at 974, 975.  Nevertheless, we found implied consent because Nichols failed to make an express objection.  We recognize that Palmer conveyed her desire to complete her trial with somewhat more force than did Nichols, but we refuse to make appellate review hinge upon weighing and interpreting a defendant's previously stated feelings.  Rather, we must insist upon express objections.

The facts of this case make clear the rationale behind our insistence upon such procedural formalities.  Palmer's counsel voiced Palmer's desire to "get it over with" when all the parties were

under the impression that Palmer would be available for trial within two days. After it was discovered that Palmer would actually require another week to recuperate before she could stand trial, counsel did not restate Palmer's wishes to conclude the trial in the same proceeding. The trial court at that point had no idea whether these new circumstances had caused Palmer to change her mind about pressing forward with the trial, or whether her previously stated desire to "get it over with" was an objection to any later declaration of a mistrial. Defendants must make timely, express objections to mistrials declared <u>sua sponte</u> by a judge. Palmer made no such objection in this case, and we will not listen to her present objection. Accordingly, we find Palmer has waived her double jeopardy argument.

III.

Palmer next attacks the denial of her motion to sever. Although strongly argued, once again, we need not reach the merits of Palmer's position, for we find that she has waived her severance claim.

Under the Federal Rules of Criminal Procedure, a motion to sever must be made before trial. Fed. R. Crim. P. 12(b)(5). Failure to move for severance before trial results in waiver of any severance claim, <u>United States v. Castillo</u>, 77 F.3d 1480, 1490 n.19 (5th Cir.), <u>cert. denied</u>, 117 S. Ct. 180 (1996); <u>United States v. Perez</u>, 648 F.2d 219, 223 (5th Cir. Unit B June 1981), <u>cert. denied</u>, 102 S. Ct. 602 (1981), absent a showing of good cause, Fed. R. Crim. P. 12(f).

Before her first trial, Palmer filed a timely motion for severance, which the trial court denied. After the mistrial, however, Palmer did not raise the severance issue again until she made an oral motion eight days after her retrial had commenced. The government contends that this severance motion was untimely under Rule 12(b)(5). It argues that the mistrial invalidated all motions made by Palmer at her first trial, requiring her to reassert them at the second in a timely manner. Moreover, it points to a colloquy before the retrial between Palmer's counsel and the trial court that indicates that Palmer was on notice that her earlier-filed motions would not be carried to the second trial:

7

MS. CONN: Is it safe to assume, your honor, that motions previously filed in this case with regard to the jurors questions and the special issues, jury charge, other motions that were granted or denied in previous courts will get the same ruling in this court?

THE COURT: I don't want to make an overly generalized ruling and then blank. If you can be a little more specific.

MS. CONN: What I have not done, your honor, I have not re-submitted all my pretrial motions and things like that, that were previously addressed. I'm asking if the court's orders that were previously filed, previously ruled upon motions carry into this trial.

THE COURT: I don't think that's a safe assumption . . . .

Despite this warning from the trial court, Palmer did not urge again her severance motion before the retrial.[1]

Palmer argues that the law-of-the-case doctrine saves her from procedural default. According to the Supreme Court, "[a]s most commonly defined, [the law-of-the-case] doctrine posits that when a court decides upon a rule of law, that decision should continue to govern the same issues in subsequent stages in the same case." Arizona v. California, 460 U.S. 605, 618, 103 S. Ct. 1382, 1391, 75 L. Ed. 2d 318 (1983). The law-of-the-case doctrine applies to both civil and criminal proceedings. Paul v. United States, 734 F.2d 1064, 1066 (5th Cir. 1984).

Palmer points to a decision of the Sixth Circuit, United States v. Todd, 920 F.2d 399 (6th Cir. 1990), which holds that a court may recognize and enforce rulings made before a mistrial, so as to avoid having to redecide the issues de novo at a retrial, id. at 404. Palmer contends that the trial court's rulings before the mistrial thus became the "law of the case," negating any duty on Palmer's part to preserve the issues for appeal from the retrial.

We have previously focused much of our discussion about the law-of-the-case doctrine on the relitigation of issues following appeal. See, e.g., United States v. Grosz, 76 F.3d 1318, 1329 (5th Cir.), cert. denied, 117 S. Ct. 167 (1996); White v. Murtha, 377 F.2d 428, 431-32 (5th Cir. 1967). The law-of-the-case doctrine does not, however, set a trial court's prior rulings in stone, especially if revisiting those rulings will prevent error. See Vincent v. International Bhd. of Elec. Workers, 622 F.2d 140, 149 (5th Cir. 1980). For example, we have held that in civil cases a district court is not

---

[1]As neither party contends that a severance motion would have been untimely if it had been refiled after the court's warning but before trial, see Fed. R. Crim. P. 12(c), we do not reach that issue.

8

precluded by the law-of-the-case doctrine from reconsidering previous rulings on interlocutory orders such as summary judgment motions, as those rulings are not immutable and lack res judicata effect. See Lavespere v. Niagra Mach. & Tool Works, Inc., 910 F.2d 167, 185 (5th Cir. 1990), cert. denied, 114 S. Ct. 171 (1993); United States v. Horton, 622 F.2d 144, 148 (5th Cir. 1980). Moreover, we have noted that district courts hearing criminal cases may revisit pretrial issues, such as suppression motions, upon which they have previously ruled. See United States v. Montos, 421 F.2d 215, 220 (5th Cir. 1970).

Even considering the law-of-the-case doctrine, we agree with the government and find waiver under these circumstances. A retrial following a mistrial is both in purpose and effect a new trial. Accordingly, objections made at the aborted trial have no bearing on the retrial, as the two are entirely separate affairs. See United States v. Mann, 590 F.2d 361, 371 (1st Cir. 1978) ("Defendant's present argument that the district court's rulings at the mistrial two days earlier made objection unnecessary cannot be accepted; a rule that one objection preserves an issue during any retrials would make the domain of a trial judge more of a mine field than ever."); see also United States v. Bettenhausen, 499 F.2d 1223, 1230 (10th Cir. 1974); Savage v. United States, 295 F. 686, 687 (4th Cir. 1924).[2] Although formal, written motions such as severance motions may have more of a lasting effect than simple objections, our previous analysis of the law-of-the-case doctrine indicates that district courts are not always bound by their prior rulings on pretrial motions. Here, the trial court expressed in unambiguous terms that it would not automatically revive any of Palmer's pretrial

---

[2]We acknowledge that one Circuit has implied that motions filed midtrial that would normally be required to be filed pretrial are not waived if they "renew" a claim properly asserted before a previous trial of the case that later ended in mistrial. See United States v. Worthington, 698 F.2d 820, 822-24 (6th Cir. 1983). The Worthington court assumed that such a renewal does not implicate Rule 12(f), which provides:

> Failure by a party to raise defenses or objections or to make requests which must be made prior to trial, at the time set by the court pursuant to subdivision (c), or prior to any extension thereof made by the court, shall constitute waiver thereof, but the court for cause shown may grant relief from the waiver.

Fed. R. Crim. P. 12(f). We find nothing in the language of Rule 12(f) to support this "renewal" theory.

motions. Given that the trial court had the authority to reconsider these motions, the court's statement placed Palmer under the duty to reurge them.

Our Circuit has not previously considered the application of the law-of-the-case doctrine to rulings made by trial courts before mistrials in criminal cases. Palmer urges that we adopt the reasoning of the Todd case from the Sixth Circuit, which held that a trial court may, following a mistrial, apply its prior rulings to a retrial, but it is not required to do so. See Todd, 920 F.2d at 404. If anything, however, Todd cuts against Palmer's position, for it establishes that district courts have the option either to recognize or reject their pretrial rulings in cases that end in a mistrial. In that sense, Todd is in keeping with our previous law-of-the-case jurisprudence, which grants trial courts the power to reconsider their own rulings. We have no quarrel with this principle. Here, the trial judge told Palmer it was not safe to assume that the court would recognize all of its previous rulings. Thus, Palmer was on notice that the trial court was not going to apply the law-of-the-case doctrine to preserve her previous objections. Accordingly, Palmer had an obligation to reassert her severance motion in a timely fashion if she wished to preserve error. Failing to do so, Palmer waived her severance claim. Fed. R. Crim. P. 12(f).

IV.

The remaining issues in this case require briefer discussion. DeBlasio challenges the effectiveness of his trial counsel, but the record indicates that he failed to raise this claim before the trial court. We do not entertain ineffective assistance of counsel claims on direct appeal when they have not been raised before the trial court, as the trial court is the proper place to develop the record necessary for their resolution. See United States v. Higdon, 832 F.2d 312, 313-14 (5th Cir. 1987), cert. denied, 108 S. Ct. 1051 (1988). Only in "rare cases where the record allow[s] us to evaluate fairly the merits of the claim" will we resolve ineffective assistance issues on direct appeal. Id. DeBlasio makes a variety of challenges to his trial counsel's trial strategy and technique, challenges which require further evidentiary development. Because the record is insufficient for us to evaluate

fairly the merits of DeBlasio's claim, we decline to resolve the issue. We do so without prejudice, however, so DeBlasio retains the right to dispute his counsel's effectiveness collaterally.

Both Palmer and DeBlasio challenge their sentences. Palmer argues that the district court erred in failing to depart downward from the Sentencing Guidelines on account of her personal circumstances relating to her history of pregnancy complications. We are without jurisdiction to resolve this claim. We may only review a trial court's refusal to grant a downward departure from the Guidelines if the refusal was based on a violation of the law. See United States v. Mitchell, 964 F.2d 454, 462 (5th Cir. 1992). Thus, we have jurisdiction if a district court's refusal to depart downward is premised upon the court's mistaken conclusion that the Guidelines do not permit such departure, but we have no jurisdiction if the court's refusal is based on its determination that departure is not warranted on the facts of the case. See id. A defendant's mere dissatisfaction with the trial court's refusal to depart downward forms no basis for an appeal. United States v. Flanagan, 87 F.3d 121, 125 (5th Cir. 1996). Here, the trial court understood that it had the authority to depart to account for circumstances not adequately taken into consideration by the Guidelines, see U.S.S.G. § 5K2.0, but it found Palmer's pregnancy complications insufficient to warrant departure. Accordingly, we lack jurisdiction to review the trial court's sentencing decision.

DeBlasio challenges the district court's application of the Guidelines to his case. Although we review a district court's interpretation of the Guidelines de novo, United States v. Brown, 54 F.3d 234, 240-41 (5th Cir. 1995), we review a trial court's fact findings in support of its application of the Guidelines for clear error, United States v. Tansley, 986 F.2d 880, 884 (5th Cir. 1993). DeBlasio first argues that the district court improperly calculated the total level of loss arising from the telemarketing scheme. The District Court sentenced DeBlasio based on a total loss to victims of $3,050,354.55, resulting in a six level increase in his base offense level. U.S.S.G. § 2S1.1(b)(2)(G). DeBlasio asserts that this figure overstates the loss to victims, as it purports to represent the total amount collected in the scheme but does not account for the value of products received by the victims, refunds, bounced checks, and stop payment orders. The district court, however, found that

11

the government, which generated the total loss figure, had done its best to exclude such items from its calculations. This district court's findings on this issue were not clearly erroneous.

Finally, DeBlasio argues that the trial court erred by applying U.S.S.G. §3B1.1(a) to his sentence, which increased his offense level by four levels because he was an organizer or leader of criminal activity that involved five or more participants. We find no clear error in the court's application of §3B1.1(a) to an individual who founded a fraudulent telemarketing company that at one point employed 120 telemarketers to carry out his scheme.

V.

For the foregoing reasons, the convictions and sentences of Palmer and DeBlasio are AFFIRMED.